DAVID A. HUBBERT
Acting Assistant Attorney General

JEREMY N. HENDON
NITHYA SENRA (CA SBN 291803)
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 683, Ben Franklin Station
Washington, D.C.  20044
Phone: 202-353-2466 (Hendon)
       202-307-6570 (Senra)
Fax:    202-307-0054
Email: Jeremy.Hendon@usdoj.gov
       Nithya.Senra@usdoj.gov
*Attorneys for the United States of America*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEVIN KALKHOVEN,<br><br>　　　　Plaintiff,<br><br>　　　　v.<br><br>UNITED STATES OF AMERICA<br><br>　　　　Defendant. | Case No. 2: 21-cv-01440-KJM-JDP<br><br>**RESPONSE IN OPPOSITION TO PLAINTIFF'S PETITION AND MOTION**<br><br>Virtual Hearing on Aug. 30, 2021 at 3:30pm<br><br>Before Chief Judge Kimberly J. Mueller |

## **TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................... 1

II.   STATEMENT OF FACTS ..................................................................................... 2

   A.    Plaintiff's Looming Liabilities and Precipitous Sale of His Alamo Mansion ................. 2

   B.    Information Learned Prior to Jeopardy Assessment ........................................... 3

     1. St. Moritz Dorf Appears to Hold Alamo Mansion as Plaintiff's Nominee ....................... 3

     2. Plaintiff Places Assets Beyond the Reach of Creditors ........................................ 4

     3. Plaintiff's Apparent Insolvency ........................................................... 6

     4. Plaintiff's History of Complex Tax Avoidance Schemes.......................................... 8

   C.    The Jeopardy Assessment ................................................................. 9

   D.    Notice and Collection of Jeopardy Assessments ............................................. 9

   E.    Information Obtained After Jeopardy Assessment Made ....................................... 10

III.  APPLICABLE LAW AND ARGUMENT ................................................................ 12

   A.    Background Law .......................................................................... 12

   B.    The Court Lacks Jurisdiction Over Plaintiff's Request to Review The Jeopardy Levies or Liens Issued By The IRS. ....................................................................... 14

   C.  The Jeopardy Assessment is Reasonable ..................................................... 14

     1. Plaintiff Was Designing to Place His Property Beyond the IRS's Reach ....................... 14

     2. Plaintiff also appeared to be approaching insolvency........................................ 18

     3. Subsequent evidence proves the IRS's concerns .............................................. 18

   D.    Plaintiff's Arguments Fail to Show that the IRS Acted Unreasonably ......................... 19

     1. Plaintiff invents a broad legal standard that does not exist................................ 19

     2. Plaintiff Misconstrues the "Quickness" Legal Test ......................................... 20

     3. It Is Not Relevant that the IRS May Have Gotten Some Facts Wrong........................... 21

     4. Plaintiff's Procedural Objections Fail..................................................... 23

     5. Jeopardy Cases Do Not Have to Involve Criminal Activity..................................... 24

   E.    The IRS Properly Levied On Assets Of Kimm ................................................. 25

   F.    The Amounts Assessed Are Appropriate....................................................... 25

IV.   CONCLUSION.................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Babb v. Schmidt*,
496 F.957 (9th Cir. 1974) ......................................................................25

*BCP Trading and Investments, LLC v. Comm'r*,
991 F.3d 1253 (D.C. Cir. 2021) ..............................................................3

*BCP Trading and Investments, LLC v. Comm'r*,
Dkt. 10201-08, T.C. Memo. 2017-151 ........................................3, 7, 8

*Bean v. United States*,
618 F.Supp. 652 (N.D. Ga. 1985) ...........................................13, 14, 15, 17

*Burd v. United States*,
774 F. Supp. 903 (D. N.J. 1991) .......................................................19, 20

*Camp v. Commissioner of Internal Revenue*,
635 F.Supp. 585 (E.D. La. 1986) ..........................................................19

*Cantillo v. Coleman*,
559 F.Supp. 205 (D. N.J. 1983) ......................................................13, 21

*Central De Gas De Chihuahua v. United States*,
790 F.Supp. 1302 (W.D. Tex. 1992)......................................................17

*Chadwick v. Comm'r*,
154 T.C. 84 (2020)...................................................................................23

*Conforte v. United States*,
1980 WL 1491 (D. Nev. Jan. 2, 1980)....................................................17

*DeLauri v. United States*,
492 F.Supp. 442 (W.D. Tex. 1980)...................................................12, 20

*Dengin v. Commissioner*,
2017 WL 2889678 (C.D. Cal. June 13, 2017) ...................................19, 22

*Fargo v. C.I.R.*,
447 F.3d 706 (9th Cir. 2006) .................................................................24

*Felkel v. United States*,
570 F.Supp. 833 (D. S.C. 1983).......................................12, 14, 17, 20

*French v. United States*,
1979 WL 1430 (E.D. Okla. July 31,1979)........................................20, 21

*Fumo v. United States*,
2014 WL 2547797 (E.D. Pa. June 5, 2014) ......................................19, 20

*Garcia v. United States*,
714 F.Supp. 1036 (N.D. Cal. 1989) .......................................................12

*Golden ADA, Inc. v. United States*,
934 F.Supp. 341 (N.D. Cal. 1996) ...................................................13, 21

*Golden West Holdings Trust v. United States*,
2009 WL 1457107 (D. Ariz. May 21, 2009) .....................................13, 21

*Harvey v. United States*,
730 F.Supp. 1097 (S.D. Fla. 1990) ................................................ *passim*

*Haskin v. United States*,
444 F.Supp. 299 (C.D. Cal. 1977) ....................................................17, 18

*Hecht v. United States*,
609 F. Supp. 264 (S.D.N.Y. 1985)..........................................................12

*Hirschhorn v. United States*,
  662 F. Supp. 887 (S.D.N.Y. 1987)............................................................19, 20
*Mesher v. United States*,
  736 F.Supp. 233 (D. Or. 1990) ...............................................................14
*Miller v. United States*,
  615 F.Supp. 781 (N.D. Ohio 1985)...........................................................12, 13
*Nolan v. United States*,
  539 F.Supp. 788 (D. Ariz. 1982) ............................................................12, 13, 19
*Revis v. United States*,
  558 F.Supp. 1071 (D. R.I. 1983)............................................................. *passim*
*Serpa v. United States*,
  1981 WL 1759 (D. Neb. Mar. 12, 1981) ...................................................12, 13, 21
*United States v. Doyle*,
  482 F.Supp. 1227 (E.D. Wis. 1980)..........................................................13
*Wellek v. United States*,
  324 F.Supp.2d. 905 (N.D. Ill. 2004) ......................................................13, 14, 18, 21
*Zion Coptic Church. Inc. v. United States*,
  1979 WL 1333 (S.D. Fla. Mar. 19, 1979)...................................................17

## Statutes

26 U.S.C. § 1445..................................................................................11, 22
26 U.S.C. § 6751(b)...............................................................................23
26 U.S.C. § 6861....................................................................................12
26 U.S.C. § 7429...............................................................................12, 13, 21
26 U.S.C. § 7429(b)..............................................................................14, 22
26 U.S.C. §§ 7429(b)(3)(A) and (B)...........................................................12
26 U.S.C. § 7429(f)................................................................................12
26 U.S.C. § 7429(g)(1) ..........................................................................12

## Other Authorities

26 C.F.R. §1.6851-1...............................................................................15, 18
26 C.F.R. § 301.6861-1(a).......................................................................18
34A Am. Jur.2d *Federal Taxation* ¶ 105,201 ..............................................6
https://www.occrp.org/en/investigations/tax-rules-for-super-rich-make-isle-of-
  man-haven-for-private-jets ..................................................................5

# I.     INTRODUCTION

After joining the ranks of the ultra-rich as CEO of a Bay Area telecommunications company in 1999 and 2000, Kevin Kalkhoven ("Plaintiff") sought to avoid taxes on that income by participating in abusive illegal tax shelters through sham partnerships and fake losses. Plaintiff has successfully delayed his day of reckoning for this behavior for decades. After the Tax Court issued a scathing rebuke of Plaintiff's abusive tax avoidance scheme, Plaintiff appealed, only to be rebuffed when the D.C. Circuit Court of Appeals affirmed the Tax Court's decision earlier this year on March 23, 2021. Yet even with the ruling, the IRS still could not assess or collect the long overdue debts due to the complex structure of Plaintiff's tax shelter. However, the writing was on the wall and, knowing that he was personally going to be on the hook for large tax liabilities, Plaintiff took action.

Shortly after the D.C. Circuit's decision, the IRS learned that a palatial estate in Alamo, California, that Plaintiff had called his home for almost a decade, assessed at over $30 million, was on the market for sale for only $19.5 million. By June 2, 2021, a sale of the property was pending, but the closing date was not publicly available. Fearing that a sale would mean significant funds would be moved offshore, the IRS began a quick investigation to determine whether collection of Plaintiff's tax liabilities was in jeopardy. The IRS learned that, although Plaintiff controlled the Alamo property, it was titled to a nominee, and Plaintiff routinely held property or interests in businesses through layers of entities disguising his true ownership. Plus, Plaintiff had entities, connections, bank accounts, and assets in the Isle of Man, a "safe haven" for the uber wealthy to place their assets beyond the reach of their creditors. Based on this information, the IRS reasonably feared that if the sale of the Alamo property closed, the proceeds would be sent abroad, and collection of Plaintiff's tax liabilities would be in jeopardy.

Accordingly, the IRS made a jeopardy assessment against Plaintiff for the 1999 and 2000 tax years totaling almost $350 million. Plaintiff does not contest that amount here. The IRS also quickly proceeded to issue a jeopardy levy and summons for records to the title company processing the sale of the Alamo property, hoping to collect the proceeds and obtain further information about the sale. Unfortunately, the levy was too late, and the IRS fears were realized.

Just days after the IRS served the jeopardy assessment on Plaintiff, the sale proceeds were sent offshore to a bank account in the Isle of Man in the name of the Lillehammer Trust, which is itself based in the Isle of Man.

Although professing wholesale reliance on Ernst & Young ("EY") for the various transactions at issue and preparation of his tax returns, Plaintiff remarkably submits no evidence from any EY representative. He also submits no evidence from the purported independent Isle of Man Trustee or Protector of the Lillehammer Trust. Instead, he submits only his own self-serving declaration and a declaration from his friend and personal private jet pilot.

Throughout this unfortunate saga, the IRS has acted reasonably. None of Plaintiff's procedural challenges are relevant to the Court's determination, but, even if they were, they are not valid. Plaintiff received an appropriate administrative review with the IRS Independent Office of Appeals which considered his evidence, all necessary approvals were obtained, and the IRS was not required to interview Plaintiff before making the jeopardy assessment because doing so would impede the investigation. Based on all the facts and circumstances, the Court should find the IRS's jeopardy determination is reasonable and deny Plaintiff's Petition and Motion.

## II.       STATEMENT OF FACTS

### A.   Plaintiff's Looming Liabilities and Precipitous Sale of His Alamo Mansion

In late May 2021, the IRS learned Plaintiff's expansive Bay Area residence ("Alamo Property") was listed for sale at $19.5 million. Declaration of Revenue Officer Shelley Smith ("Smith Decl."), ¶ 4. As of June 2, 2021, the listing was showing the sale as pending. *Id*. This pending status spurred the IRS into action, as it appeared that Plaintiff was days away from selling his trophy mansion at a huge reduction from the parcel's $30 million tax assessed value. *Id*., ¶¶ 8, 33. The IRS was aware that Plaintiff previously lived at the Alamo Property. *Id*., ¶ 5.

By this time, the IRS was also aware that Plaintiff almost certainly owed a very large amount of tax and interest dating to the 2000 and 2001 tax years. *Id*. The IRS could not, however, immediately collect this tax from Plaintiff using ordinary assessment procedures, because of ongoing litigation, and likely subsequent litigation relating to the individual consequences of Plaintiff's involvement in layers of partnerships that invested in abusive illegal

Son-of-BOSS tax shelters. *Id*., ¶¶ 5-7, Declaration of Revenue Agent Michael McGinnis ("McGinnis Decl."), ¶¶ 4-13. The D.C. Circuit had recently affirmed the Tax Court's Decision in *BCP Trading and Investments, LLC v. Comm'r*, Dkt. 10201-08, T.C. Memo. 2017-151 ("BCPTI Decision") on March 23, 2021, finding that one partnership Plaintiff had invested in was a sham. *BCP Trading and Investments, LLC v. Comm'r*, 991 F.3d 1253 (D.C. Cir. 2021). Given the sale pending status for the Alamo Property, the IRS began researching the ownership of the Alamo Property and started to investigate Plaintiff's financial status. Smith Decl., ¶ 8.

As the IRS delved deeper into the Alamo Property and Plaintiff's financial condition, it unearthed layers of entities used to hold assets, like the layers of partnerships in his tax shelter cases. A closer look at his financial condition revealed offshore bank accounts and foreign trusts, and the picture that began to come into focus revealed that collection of Plaintiff's tax liability was in jeopardy. As a result of this investigation, the IRS made a jeopardy assessment in the amounts of $279,625,588 for the 2000 tax year and $69,951,190 for the 2001 tax year. Based on the facts and circumstances known to the IRS prior to making the jeopardy assessment, the 2000 and 2001 assessments were reasonable. Even considering the information discovered after the jeopardy assessment was made, the jeopardy assessment in this case remains reasonable.

**B.   Information Learned Prior to Jeopardy Assessment**

**1. St. Moritz Dorf Appears to Hold Alamo Mansion as Plaintiff's Nominee**

The Alamo Property is expansive. *Id*., ¶ 32. It contains 101.5 acres, 8 of them planted with grape vines, and includes a 22,210 square foot mansion with 12 bedrooms and 13+ bathrooms. *Id.* It also includes a 20-car state of the art barn/museum. *Id.* The realtor.com listing that showed the property sale was pending mentioned that the car barn housed the 2013 Indy 500-winning car from Plaintiff's racing team, KV Racing Technology. *Id*., ¶¶ 13, 34. As of 2019, the Contra Costa County Assessor's value of the Alamo Property was over $30 million. However, the 2021 list price for the Alamo Property was only $19.5 million. *Id*., ¶ 33.

As of June 2, 2021, title to the Alamo Property was held in the name of St. Moritz Dorf LLC ("SMD"). *Id.* ¶ 35. SMD was formed in Texas in February 2000 by James Cox and Sally Tischler from EY as the initial managers. *Id*., ¶¶ 12, 35; *BCP Trading & Inv. LLC*, 991 F.3d at

1258. In 2001, SMD registered with the California Secretary of State and listed Sally Tischler as the manager and James Cox at EY in the return line. *Id*., ¶ 36. SMD had no assets or funding at its formation, or any time thereafter. *Id*. ¶ 38. Yet SMD purportedly purchased the Alamo Property on September 14, 2005. *Id*., ¶ 39. Beyond keeping his Indy 500-winning race car at the property, Plaintiff appeared to live at the property from when construction finished in 2006 through at least 2015. *Id*., ¶ 41.

RO Smith found an IRS record that reported SMD as the sole member (i.e. owner) of an entity called Serenity Vineyards LLC ("Serenity") but could not find any other business activity relating to SMD being reported to the IRS. *Id*., ¶ 42, Ex. 101. Serenity however was reported directly on Plaintiff's tax returns for the 2017 through 2019 tax returns as a Schedule C entity, thus implying that Plaintiff also owned SMD. *Id.*

Plaintiff's tax reporting regarding SMD and the Alamo Property was inconsistent over the years. Sometimes Plaintiff provided a Schedule C for SMD on his tax return (2016) and sometimes he claimed depreciation related expenses as deductions without a Schedule C (2017 and 2018) but identified SMD as one of his passive activities (2017 and 2018). *Id*., ¶ 43. Thus, it appeared that SMD was holding title to the Alamo Property as the nominee of Plaintiff, and that Plaintiff was the true owner of the multi-million-dollar mansion that was about to be sold.

### 2. Plaintiff Places Assets Beyond the Reach of Creditors

Through reviewing both public information and IRS records, RO Smith discovered that Plaintiff frequently used LLCs, foreign holding companies, and foreign partnerships to conceal assets from creditors—beyond the use of SMD to conceal his ownership of the Alamo Property. In other words, assets were held by shell companies and partnerships rather than in Plaintiff's name, with the foreign entities often located in known tax havens. This layer of concealment makes the assets difficult for creditors to reach when attempting to collect against Plaintiff.

### a. Layers of Shell Companies

Plaintiff is the reported co-owner of Cosworth, but his ownership interest in Cosworth is structured in at least two layers. *Id*. ¶14. Cosworth itself is held by a shell company Cosworth Group Holdings Limited ("CGHL") and that shell company is in turn held 50% by a foreign

partnership called CGH (Isle of Man) Holdings Limited ("CGH") and 50% by an apparent unrelated third party. *Id*., ¶¶ 14-15. Plaintiff appears to own his 50% interest in CGHL through CGH, an entity in the Isle of Man, a well-known tax haven for the super wealthy. *Id*.; *see also* https://www.occrp.org/en/investigations/tax-rules-for-super-rich-make-isle-of-man-haven-for-private-jets [https://perma.cc/C2ZW-2PY2].  RO Smith pieced all of this information together by reviewing various federal tax returns and IRS records. *Id*. RO Smith also discovered that Plaintiff was the sole proprietor of an entity called Fox Crossings Properties LLC ("Fox"), another shell company, linked to Plaintiff's associate Pierre Wildman and located at the same address as SMD (3000 Danville Blvd., Ste. F500, Alamo, California). *Id*., ¶ 35. Fox was connected to properties in Aspen, Colorado, but these properties were sold in 2012, 2013 and 2015, and as of June 2021, it does not appear that Fox holds any additional properties. *Id*., ¶¶ 56-57.

KPW Holdings LLC ("KPW") appears to be another shell company used by Plaintiff, that holds title to real property at 757 Benecia Road, Vallejo, California ("Vallejo Property"). *Id*., ¶ 51. There is no record of KPW filing a return with the IRS. KPW has the same Danville Boulevard address as SMD and is also linked to Pierre Wildman. IRS records reflect that KPW was established in October 2007 and was listed in care of another entity called KOK Sheridan Way Investments LLC ("KOK"). A review of IRS records relating to KOK, meanwhile, showed that KOK engaged in over 500 sales transactions in 2019 generating $193,193 in proceeds for KOK. *Id*., ¶ 53. Some of these sale transactions also linked to Plaintiff's wife (Kimm), Serenity LLC, and one of Plaintiff's business partners. *Id*. Plaintiff also appeared to use KOK to sell assets such as stocks and bonds without reporting those transactions, raising concerns that Plaintiff could quickly liquidate securities without tipping off the IRS. *Id*., ¶ 76.

Plaintiff's most recent residence is a property in Truckee, California, near the shores of Lake Tahoe ("Truckee Property"). The Truckee Property was purchased in 2014 by an entity called Overlook Holdings LLC ("Overlook") and consists of a 5,592 square foot home with 5 bedrooms and 6 bathrooms constructed in 2016. *Id*., ¶ 48. Overlook is the current title holder, and IRS records list Pierre Wildman as the sole member of Overlook, which uses the same Danville Boulevard address as SMD, Fox, and KPW. *Id*., ¶ 49. Thus, Plaintiff's current home is

also held in a shell company closely affiliated with Plaintiff's various other shell companies. The IRS was concerned that the use of these various layers of entities to keep assets out of Plaintiff's name appeared to place Plaintiff's assets outside the reach of his creditors, including the IRS.

### b. Plaintiff's Use of Offshore Financial Accounts and Entities

Further, a significant amount of Plaintiff's assets and investments were in foreign countries that would make it difficult, if not impossible, to collect from when the time came. *Id.*, ¶¶ 19-21, 25-26. Plaintiff had over 20 reported foreign financial accounts with several banks in the Isle of Man (Nedbank Private Bank, Royal Bank of Scotland, Royal Bank of Scotland International, and Collins Stewart), some of which appeared to be in the name of the Lillehammer Trust. *Id.*, ¶ 25. As noted above, the Isle of Man is a known tax haven and a location from which it is difficult, if not impossible, for creditors to collect assets. *Id.*, ¶19; *see also* 34A Am. Jur.2d *Federal Taxation* ¶ 105,201 "Use of Offshore Trusts for Asset Protection" (2021); *Bank Frauds and Tracking the Hidden Assets*, 12 FLAMULR 55, 77 and n.162 (2016) ("notwithstanding the numerous regional agreements permitting discovery, there remain a number of countries that act as 'safe havens' for those assets that debtors wish to put beyond the reach of their creditors" and including the Isle of Man as one such place).

It is unknown if Plaintiff has additional foreign accounts. *Id.*, ¶ 26. Plaintiff's ownership interest in Cosworth is held by an Isle of Man entity. *Id.*, ¶ 15. Through at least 2014, and maybe longer, Plaintiff appeared to own an airplane through a holding company, also in the Isle of Man. *Id.*, ¶ 17. Many of Plaintiff's offshore ventures are connected with an offshore entity called the Lillehammer Trust. *Id.*, ¶¶ 17, 59. And there were numerous other foreign entities that appeared on various records connected to Plaintiff, but both their connection to Plaintiff and if they held additional funds or assets were unknown. *Id.*, ¶ 59. Even if the IRS were to locate a taxpayer's assets in a foreign country, collection of those assets is difficult if not impossible. *Id.*, ¶ 74. The IRS suspected (and later confirmed) that should the Alamo Property be sold, the funds could be quickly transferred offshore and outside its reach.

### 3. Plaintiff's Apparent Insolvency

Additionally, the IRS was concerned with what appeared to be Plaintiff's creeping

insolvency. The IRS noticed that while Plaintiff was still earning money over the past few years, the amounts he earned in the United States were declining. *Id.*, ¶ 78. Further, in 2017, Plaintiff stepped down from the KV Racing Technology team because he felt he could "no longer give the team the effort and support it and the team members deserve," suggesting Plaintiff no longer had the means to fund his racing hobby. *Id.* The IRS noticed that at the same time, Plaintiff began selling more of his assets. *Id.*, ¶ 79. In addition to the unreported KOK stock and bond sales, between 2014-2020 Plaintiff sold $50,781,732 worth of stock. *Id.*, ¶ 24. In April 2021, Plaintiff and his wife sold property located at 1814 Roland Street, Sarasota, Florida ("Sarasota Property"), shortly after the BCPTI Decision. Plaintiff also had the Alamo Property on the market as well, with a suddenly pending sale.

While Plaintiff has been taking all these actions, he has been reporting no taxable income. Plaintiff's Forms 1040 for the past decade show large losses. *Id.*, ¶¶ 60-63; 79. According to those Forms 1040, Plaintiff's financial condition is not healthy, to the point where he received $1,800 in federal stimulus funds in 2020. *Id.*, ¶ 63. Further, Plaintiff's representative told the IRS that Plaintiff only has a fraction of the assets necessary to pay his tax liabilities. *Id.*, ¶ 109.

### a. Sarasota Property Sale

RO Smith learned that Plaintiff and Kimm purchased the Sarasota Property in 2015 in their individual names, which could allow them to claim Florida residency and avoid California state income tax. *Id.*, ¶¶ 27-29. On April 16, 2021, Plaintiff and Kimm sold the Sarasota Property for $5,595,000. The sale closed less than one month after the D.C. Circuit issued its decision affirming the Tax Court's disallowance of Plaintiff's abusive BCPTI Son-of-BOSS tax shelter, which would result in Plaintiff owing substantial tax liabilities. Just a couple of months earlier, the IRS had rejected Plaintiff's offer to settle these tax liabilities. When the IRS made the jeopardy assessment, it did not know what happened to the proceeds from that sale. However, given Plaintiff's interest in many foreign bank accounts, the IRS was reasonably concerned that it would have been fairly easy for him to move the proceeds offshore. *Id.*, ¶ 30.

### b. Post 2006 Income Tax Filings Raise Red Flags

RO Smith also checked Plaintiff's federal tax filing history to learn more about his

financial condition and found that for the past 15 years, Plaintiff has reported no taxable income and has paid tax only three times, in 2007, 2009, and 2019. *Id.*, ¶ 60. Plaintiff reported a very large Net Operating Loss (NOL) in 2006, that he carried forward to offset income earned in later tax years. *Id.*, ¶ 62. However, this NOL did not make much sense, as it appeared to originate in 2006 but somehow increased many years later, without explanation. *Id.*, ¶ 61. The IRS is unaware of the nature of that NOL, whether it was the result of Plaintiff's involvement in another abusive illegal tax shelter, or whether it is valid. *Id.*, ¶ 62. Taxpayers are supposed to explain NOLs they are taking on their tax returns, but such explanation is lacking from Plaintiff's returns. *Id.* The large losses over the past 15 years painted the picture of a deteriorating financial condition to the point that he received $1,800 in federal stimulus funds in 2020. *Id.*, ¶¶ 63, 80.

### 4. Plaintiff's History of Complex Tax Avoidance Schemes

Contrary to Plaintiff's suggestion that he is a compliant taxpayer, he in fact has a history of using every tool possibly to avoid paying his fair share. As relevant to the assessments here, in 1999 and 2000, Plaintiff engaged EY to minimize his federal tax liability arising from the enormous income he earned in 1999-2001. *Id.*, ¶ 11. Plaintiff participated in several illegal abusive tax shelters during those years with some side issues extending to at least 2004. *Id.* In order to help Plaintiff avoid tax, EY created several complex transactions, in which Plaintiff participated, that were designed to give the appearance of legitimate investments and entities trying to make a profit. *Id.* But in the end, they were just a disguised plan using layers of partnerships and other entities to evade taxes. *Id.*

The IRS began an examination in June 2002 that ultimately culminated with the D.C. Circuit's BCPTI decision in March 2021. McGinnis Decl., ¶ 4. In addition to the BCPTI abusive Son-of-BOSS tax shelter, Plaintiff was no stranger to participating in other abusive illegal tax shelters to try and avoid assessment of taxes on his income and gains. *Id.*, ¶¶ 5-6. In 1999, Plaintiff engaged in another abusive illegal Son-of-BOSS tax shelter that is still the subject of a Tax Court case. *See Woodside Partners v. Commissioner*, docket no. 5685-16. It is expected that Plaintiff will owe an additional $25 million as a result of this case. *Id.*, ¶ 5 Plaintiff also participated in three more abusive tax shelter transactions in 1999, 2000, and 2001 known as

Notional Principal Contracts ("NPC"). *Id*., ¶ 6. Plaintiff is hardly the model of a compliant taxpayer; rather, his history shows that he has consistently waged lawfare against the IRS in his attempts to avoid paying taxes. Indeed, this case just continues the pattern.

### C.   The Jeopardy Assessment

Based on these facts and circumstances, the IRS concluded that collection of Plaintiff's large tax liabilities for 2000 and 2001 was in jeopardy. The IRS began the process of obtaining the necessary approvals for a jeopardy assessment in mid-to-late June 2021 with the goal of making the assessment and issuing the jeopardy levy to the escrow company conducting the sale of the Alamo Property before the sale proceeds could be disbursed. Smith Decl., ¶ 81. The IRS was concerned that if it did not act before the proceeds were disbursed, it would be unable to collect the proceeds and apply them to Plaintiff's large tax liability, as they could be transferred anywhere, including offshore to the Isle of Man. *Id*.

Before the IRS could obtain all the necessary approvals for the jeopardy assessment and jeopardy levy to the escrow company, the IRS learned that the sale of the Alamo Property had closed on June 30, 2021. *Id*., ¶ 82. On July 1, 2021, the IRS decided to go forward with the jeopardy assessment, as collection of Plaintiff's 2000 and 2001 tax liabilities was still perceived to be in jeopardy, and there was still a chance the IRS could intercept the funds from the Alamo Property sale. *Id*., ¶ 83. On July 2, 2021, the IRS made the jeopardy assessment for tax years 2000 and 2001 against Plaintiff. The total amounts due from Plaintiff for his 2000 and 2001 tax years are as follows:

|  | 2000 tax year | 2001 tax year | Total |
|---|---|---|---|
| Tax Deficiency | $186,543,653 | $28,692,767 | $215,236,420 |
| Penalty | $134,601 | $579,094 | $713,695 |
| Interest (through 7/15/21) | $209,809,622 | $40,679,329 | $250,488,951 |
| Deposits made in 2006-08 | ($116,500,000) |  | (116,500,000) |
| 6404(g) not refunded | ($362,287) |  | ($362,287) |
| **TOTAL** | $279,625,588 | $69,951,190 | $349,576,778 |

### D.   Notice and Collection of Jeopardy Assessments

After the IRS served the required notices on July 6, 2021, RO Smith issued 13 levies to various sources to collect Plaintiff's tax liabilities. *Id*., ¶¶ 85-92; Exhibit 104. RO Smith also ensured a total of eight Notices of Federal Lien ("NFTL") were recorded in varying locations

associated with Plaintiff. *Id.* ¶ 97, Exhibit 105. On August 6, 2021, the IRS received Plaintiff's administrative appeal and protest regarding the levies and liens that had been issued ("Jeopardy Levy and Lien Protest"). Plaintiff's representative clarified that Plaintiff submitted the Jeopardy Levy and Lien Protest as a protective measure to ensure that the levies are released and the NFTLs are withdrawn if the jeopardy assessment is abated by this Court. *Id.*, ¶ 98.

### E.   Information Obtained After Jeopardy Assessment Made

After making the jeopardy assessment, RO Smith was able to issue administrative summonses to third parties in aid of collecting the assessed tax liabilities for 2000 and 2001. *Id.* ¶ 100. The IRS obtained additional information that bolsters the concern that collection of these tax liabilities is in jeopardy. *Id.* For example, with regard to SMD and the Alamo Property, Plaintiff had another layer of nominal ownership on the Alamo Property, this time with a foreign trust, and the sale proceeds from the Alamo mansion have in fact been transferred offshore to the Isle of Man. *Id.* This information not only supports and confirms the IRS's concerns about Plaintiff's ownership and sale of the Alamo Property, but it also completely contradicts Plaintiff's assertions regarding SMD and the Alamo Property.

The IRS also obtained information confirming its suspicions about SMD. The February 7, 2001 formation documents show that Plaintiff was working with EY to form SMD at the same time he was also working with EY to engage in abusive illegal tax shelters to try to avoid tax on his income and gains. *See* Exhibit 106, Regulations of St. Moritz Dorf, L.L.C., a Texas Limited Liability Company ("SMD Regulations"), p. 1 and ¶ 1.1. (Notably, though Plaintiff claims to have relied on EY, no one from EY has come forward as a witness to defend any of the schemes here.) In addition, Exhibit A attached as the last page to the SMD Regulations shows that Plaintiff only contributed $100 to SMD, which further supports the conclusion that SMD lacked sufficient funds to purchase the Alamo Property independent of Plaintiff.

Moreover, the records revealed that, on February 9, 2011, Plaintiff purported to assign his 100% interest in SMD to Cook Islands Trust Ltd., as Trustee of the Lillehammer Trust, and then subsequently, First Names Trust Company (Isle of Man) Limited which later became the Trustee of the Lillehammer Trust. *See* Exhibit 107, First Amended Regulations of St. Moritz Dorf,

L.L.C., Effective January 24, 2019 ("SMD Amendment"), Recitals, ¶ B. However, it appears that the Lillehammer Trust did not give anything of value in exchange for this transfer.

Nonetheless, Plaintiff continued to act as owner of the Alamo Property when it suited him. In connection with the Alamo sale, Plaintiff signed *Seller's Certification As To Foreign Or Non-Foreign Status Under Foreign Investment in Real Property Tax Act ("FIRPTA") (26 U.S.C. § 1445)* ("FIRPTA form"). *See* Exhibit 108. In the FIRPTA form, Plaintiff attests that he (not SMD) is the seller. Smith Decl., ¶ 103. E-mails from the escrow company handling the Alamo Property sale describe Plaintiff meeting with realtors at the mansion to settle some final closing matters and negotiating deal terms so that the property caretaker would remain in the same role (and equally compensated). *Id*.

Likewise, the records revealed Plaintiff's control of SMD, as the IRS had suspected. Bank signature cards for SMD's account at Bank of America list Plaintiff's name and social security number as a signatory. *See* Exhibit 110. Most of the deposits into SMD's account were sourced from a Bank of America account in the name of Kevin Kalkhoven, Sole Prop. *See* Exhibits 111-112. These facts support that SMD held the Alamo Property as Plaintiff's nominee.

Additionally, SMD's Bank of America account statement shows a wire transfer from First American Title Company in the amount of $16,445,334.63 was received on June 30, 2021. The entry notes that the wire was for proceeds regarding 10 Serenity Lane, Alamo, CA. Then, in the July 2021 statement, there are four separate wire transfers totaling $16,203,040.17 to an account at the Royal Bank of Scotland in the Isle of Man for the Lillehammer Trust on July 2 (only $100) and July 8-9, 2021. Although the funds arrived in the account on June 30, 2021, almost all were only transferred offshore after the IRS provided Plaintiff with notice of the jeopardy assessment on July 6, 2021. The IRS was concerned that the sale proceeds from the Alamo Property could be quickly moved offshore, and regrettably, the IRS was proven correct. Virtually all of the funds from the sale were, in fact, sent offshore to the Isle of Man shortly after Plaintiff received notice of the jeopardy assessment, but before the IRS could levy on SMD's Bank of America account.

### III.   APPLICABLE LAW AND ARGUMENT

#### A.   Background Law

Congress created 26 U.S.C. § 6861 to allow assessment and collection in cases where more routine methods may be rendered ineffective or "jeopardized" if collection efforts are delayed. In these situations, the IRS may immediately determine the amount of the tax due, serve notice of the jeopardy assessment on the taxpayer, demand payment, and levy upon the taxpayer's property. *See Nolan v. United States*, 539 F.Supp. 788, 789 (D. Ariz. 1982). Under 26 U.S.C. § 7429, taxpayers may seek very limited judicial review of these actions on an expedited basis. The Court is *only* to decide, first, whether the determination of jeopardy, and the making of the jeopardy assessment, is reasonable under the circumstances, and, second, whether the amount assessed is appropriate under the circumstances. 26 U.S.C. §§ 7429(b)(3)(A) and (B).

Of necessity, § 7429 does not call for a full evidentiary hearing. *Hecht v. United States*, 609 F. Supp. 264, 266 (S.D.N.Y. 1985). The Court's review is not to be treated as a trial on the ultimate merits of the tax liabilities. Under § 7429, the Court must conduct a summary proceeding where both parties present the information upon which they rely in support of their respective positions. The decision of a District Court is not subject to review. 26 U.S.C. § 7429(f). In light of the time constraints involved and summary nature of the hearing, the proof the Government can use to satisfy its burden need not be in a form that satisfies the Federal Rules of Evidence. *Harvey v. United States*, 730 F.Supp. 1097, 1104 (S.D. Fla. 1990); *Miller v. United States*, 615 F.Supp. 781, 786 (N.D. Ohio 1985).

The United States must establish that the jeopardy assessment was reasonable under the circumstances. 26 U.S.C. § 7429(g)(1). "The standard of reasonableness required to support a determination under review pursuant to § 7429 is not a rigorous one." *Serpa v. United States*, 1981 WL 1759 at *2 (D. Neb. Mar. 12, 1981). "Reasonableness under the circumstances" means something more than "not arbitrary and capricious," and something less than "supported by substantial evidence." *Id.*; *see also Garcia v. United States*, 714 F.Supp. 1036, 1077 (N.D. Cal. 1989); *Harvey*, 730 F.Supp. at 1104; *Felkel v. United States*, 570 F.Supp. 833, 838 (D. S.C. 1983); *DeLauri v. United States*, 492 F.Supp. 442, 445 (W.D. Tex. 1980). The burden has been

described as similar to probable cause in a preliminary hearing in a criminal case. *Nolan*, 539 F.Supp. at 790; *United States v. Doyle*, 482 F.Supp. 1227, 1229 (E.D. Wis. 1980).

Furthermore, each specific item of information upon which the jeopardy assessment is based need not be accurate for the jeopardy determination to be reasonable under § 7429. *Serpa*, 1981 WL 1759 at *2 ("[I]t is not essential that every fact upon which the determination is based be proven accurate in a subsequent judicial proceeding in order for that determination to be reasonable under § 7429 . . . The standard is one of reasonableness, not one of substantial evidence."). In other words, the United States need only show that Plaintiff's actions *appear* to jeopardize collection, not that he will necessarily do so. *Golden West Holdings Trust v. United States*, 2009 WL 1457107, *4 (D. Ariz. May 21, 2009); *Wellek v. United States*, 324 F.Supp.2d. 905, 911 (N.D. Ill. 2004); *Golden ADA, Inc. v. United States*, 934 F.Supp. 341, 345 (N.D. Cal. 1996) ("Whether Golden ADA in fact intended to liquidate its assets and place them beyond the reach of the IRS thereby avoiding payment of its taxes is irrelevant. It is the appearance of such things that is relevant and controlling."); *Cantillo v. Coleman*, 559 F.Supp. 205, 207 (D. N.J. 1983); *Revis v. United States*, 558 F.Supp. 1071, 1078 (D. R.I. 1983). Appearances are what count: "In order to establish that the making of a jeopardy assessment is reasonable under the circumstances, the Service 'need only establish that the taxpayer's circumstances appear to be jeopardizing collection of a tax—not whether they definitely do so.'" *Miller*, 615 F.Supp. at 786 (emphasis in original) (*quoting Cantillo*, 559 F.Supp. at 207); *see also Bean v. United States*, 618 F.Supp. 652, 658 (N.D. Ga. 1985).

In general, if any of the three following conditions exist, the IRS's jeopardy assessment must be upheld; (1) the taxpayer is or appears to be planning to quickly depart from the United States to conceal himself; (2) the taxpayer is or appears to be designing to place his property beyond the reach of the Government either by removing it from the United States or by concealing it, or by transferring it to other persons, or by dissipating it; or (3) the taxpayer's financial solvency appears to be imperiled. *See Golden West Holdings Trust*, 2009 WL 1457107, at *4; *Wellek*, 324 F.Supp.2d. at 912; *Cantillo*, 559 F. Supp. at 206-207; *Nolan*, 539 F. Supp. at 790. However, the Court is not limited to consideration of only these factors in determining the

IRS's reasonableness. *Wellek*, 324 F.Supp.2d. at 912; *Mesher v. United States*, 736 F.Supp. 233, 235-36 (D. Or. 1990) (listing six factors courts will consider); *Bean*, 618 F. Supp. at 658 (listing numerous factors); *Felkel*, 570 F. Supp. at 838-41. Nothing in the caselaw or regulations requires that the taxpayer be involved in criminal activity.

**B.   The Court Lacks Jurisdiction Over Plaintiff's Request to Review The Jeopardy Levies or Liens Issued By The IRS.**

Preliminarily, Plaintiff's Complaint and Petition is defective in that it improperly seeks judicial review of any jeopardy levy or lien. Plaintiff did not exhaust his administrative remedies with respect to the jeopardy levy and liens prior to filing. Specifically, on August 6, 2021, the IRS received Plaintiff's Jeopardy Levy and Lien Protest. Smith Decl., ¶ 98. On August 16, 2021, after Plaintiff had already filed this lawsuit, RO Smith forwarded Plaintiff's Jeopardy Levy and Lien Protest to the San Francisco Independent Office of Appeals via overnight shipment. *Id.*, ¶ 99. IRS Appeals has not rendered a decision on Plaintiff's Jeopardy Levy and Lien Protest. Thus, the Court lacks jurisdiction regarding the jeopardy levies and liens. 26 U.S.C. § 7429(b).

**C.   The Jeopardy Assessment is Reasonable**

In this case, the United States' evidence establishes that jeopardy exists on the basis of numerous factors.

**1. Plaintiff Was Designing to Place His Property Beyond the IRS's Reach**

In deciding whether a taxpayer is or appears to be designing quickly to place his property beyond the reach of the Government, the question is whether the United States reasonably believes collection of the taxes is in jeopardy if it must delay assessment and collection pending pre-assessment and pre-collection administrative and judicial review. In making this determination, courts have held that the United States need not demonstrate immediate dissipation or removal of assets. *Harvey*, 730 F.Supp. at 1107. Rather, the test is whether the collection of taxes would be ineffective or jeopardized if collection efforts are delayed during the standard administrative process. *Id*. Here, the IRS acted reasonably in believing that Plaintiff was designing to place his assets beyond the reach of the Government, both quickly due to the

impending sale of the Alamo Property and also through a longer period of dissipation and obfuscation.

### a. Imminent Sale of a Large Asset Tied to Plaintiff

Although the genesis of his tax liabilities reach back over 20 years, the writing was on the wall for Plaintiff when the D.C. Circuit affirmed the Tax Court's decision on March 23, 2021, that the illegal Son-of-BOSS tax shelter[1] he had engaged in was a sham and that he would be facing a large tax liability as a result. Nonetheless, the IRS would likely remain unable to collect on Plaintiff's overdue obligations for many more years to come due to Plaintiff's ability to challenge his individual taxes in a second proceeding required due to the partnership structure of the tax shelter. Smith Decl., ¶¶ 5-7.

The IRS also knew of Plaintiff's broader history of engaging in abusive illegal tax shelters and the lengths he had gone to in setting up complex transactions to attempt to avoid tax. *Id*., ¶ 11; McGinnis Decl., ¶¶ 4-13. However, because of the complexity of Plaintiff's abusive tax shelter transactions, the IRS could not yet assess a tax liability against him personally, meaning he continued to avoid paying tax on all of the improperly sheltered income. McGinnis Decl., ¶ 13; Smith Decl., ¶¶ 5-7, 11.[2]

The IRS also knew that Plaintiff had lived in the Alamo Property for many years and that it was a valuable asset. Smith Decl., ¶¶ 8, 10. Even though he may have claimed he moved to Florida in 2015, it was not clear whether he *actually* moved to Florida or simply bought a house to show residency there to avoid state income taxes. *Id*., ¶ 29.

When the IRS became aware that the Alamo property was listed for sale at a reduced price, with a sale pending, it opened an investigation to determine whether collection might be in

---

[1] Contrary to Plaintiff's assertion on page 6 of his Motion and ¶ 48 of his Petition, Treas. Reg. § 1.6851-1(a)(1) does not state that participation in a tax shelter cannot be a legal basis for a jeopardy assessment. In fact, the regulation does not mention tax shelters at all. However, participation in tax shelters (plural), like Plaintiff has done here, is a highly relevant factor in the Court's consideration. *See, e.g. Bean*, 618 F. Supp. at 658 ("Bean was involved in the promotion and sale of abusive tax shelters, a fact which supports the conclusion that Bean is 'capable of, and willing to, avoid taxes by any method.').

[2] Plaintiff's refundable deposits with the IRS are irrelevant. Even though he deposited $116.5 million, he *still* owes approximately $349.5 million for the tax years at issue after application of those deposits. McGinnis Decl., ¶¶ 20-21. Further Plaintiff only made these deposits so that when his abusive Son-of-BOSS tax shelter was disallowed, he would not face an additional 40% penalty.

jeopardy. *Id.*, ¶ 8. That was a very prudent and reasonable thing for the IRS to do since Plaintiff was going to have large liabilities and a large potential collectible asset was about to be liquidated to cash, which is fungible, and could be quickly transferred to one of his 20 foreign bank accounts in the Isle of Man.

Although the Alamo Property was nominally titled to SMD, the IRS reasonably determined that Plaintiff was the true owner. The specific steps RO Smith took to make this determination are set forth in paragraphs and 31-46 and 72-73 of her declaration. The IRS reviewed numerous tax filings by Plaintiff, reviewed substantial third-party information it had received regarding Plaintiff, and performed research regarding SMD, including searching publicly filed documents about SMD and the Alamo Property. *Id.*, ¶¶ 9-63. Based on its review, the IRS also knew that Plaintiff has:

(1) extensive involvement with setting up his business activities and transactions in the names of other entities and in a complicating way (*id.*, ¶¶ 47-59; 67-68; McGinnis Decl., ¶¶ 4-10);

(2) involvement in foreign businesses and activities (Smith Decl., ¶¶ 21, 59 and Plaintiff's 2017-2019 Forms 1040, attached to the Report as Exhibits 14-16);

(3) access to multiple foreign bank accounts (*id.*, ¶ 25); and

(4) numerous connections to, as well as appeared to have assets located in, the Isle of Man, a known tax haven and a location that is difficult, if not impossible from which creditors can collect assets. *Id.*, ¶¶ 15, 17, 19, 21, 25, 74.

Contrary to Plaintiff's baseless assertion, the IRS conducted a remarkably thorough investigation considering the brief time before the Alamo Property was to be sold. The facts the IRS gathered more than meet the non-rigorous, probable cause standard necessary to show that the IRS acted reasonably.

### b. Many Additional Factors Show the IRS Acted Reasonably

Beyond just the Alamo Property, the following factors support the IRS's decision:

| Factor Supporting Reasonableness | Authority |
|---|---|
| Use of nominee or shell companies to hide the taxpayer's assets and conceal his true ownership. Smith Decl., ¶¶ 14-15 (Cosworth), ¶¶ 31-47 (SMD and Alamo Property), ¶¶ 47-57 (Truckee Property, KPW, KOK, Fox). | *Harvey*, 730 F.Supp. at 1101, 1107) ("The use of such shell corporations indicated an adversity toward voluntary compliance with the federal income tax laws which renders normal tax collection proceedings ineffective."); *Zion Coptic Church. Inc. v. United States*, 1979 WL 1333, *1 (S.D. Fla. Mar. 19, 1979); *Felkel*, 570 F. Supp. at 835, 838-39; *Bean*, 618 F.Supp. at 655, 658; |

| Factor Supporting Reasonableness | Authority |
| --- | --- |
| | *Central De Gas De Chihuahua v. United States*, 790 F.Supp. 1302 (W.D. Tex. 1992) (when taxpayer so blurs the line between himself and his companies, such acts may constitute the concealing and transferring of assets to establish jeopardy); *Haskin v. United States*, 444 F.Supp. 299, 302 (C.D. Cal. 1977) (jeopardy exists where taxpayer operates through shell corporations and conceals assets from the IRS). |
| Frequent travel abroad. *See* Ex. 11 (describing last minute travel to London in private jet). | *Conforte v. United States*, 1980 WL 1491, *2 (D. Nev. Jan. 2, 1980) |
| Numerous foreign assets. Smith Decl., ¶ 25 (bank accounts), ¶ 21 (table detailing 10 foreign entities), ¶ 59 (list of additional entities). | *Conforte*, 1980 WL 1491, at *2 |
| Selling assets and winding down financial activity. Smith Decl., ¶ 25 (stock sales), ¶ 13 (shuts down car racing), ¶ 23 (only $24,000 to $32,000 salary reported). | *Revis*, 558 F.Supp. at 1078 (finding jeopardy existed if "the picture emerges . . . of an orderly premeditated progression which, if continued apace, is reasonably likely to leave the government holding an empty bag"). |

Plaintiff fails to distance himself from these many factors and instead tries to confuse the issues on the following points:

*Sarasota Property*. The Sarasota property was sold in April 2021, a month after Plaintiff lost his appeal to the D.C. Circuit. Plaintiff did not deposit the sale proceeds with the IRS. Plaintiff states that the property had been on the market since 2019, went under contract in late 2020, and that the reason for moving was Plaintiff's cancer treatment. However, (1) the cancer diagnosis was in 2018, three years earlier; (2) escrow on this residential home did not close for four months (three months longer than normal); (3) the timing of the sale accelerated quickly after the IRS rejected Plaintiff's settlement offer on February 2, 2021, and the D.C. Circuit affirmed the Tax Court decision on March 23, 2021. Even if Plaintiff's version is true, it does not negate the suspicious timing of this sale. Indeed, the Court must look at what reasonably *appeared* to be the circumstances at the time, not whether Plaintiff can come up with a plausible after-the-fact explanation. *See Revis*, 558 F.Supp. at 1077

*Obscured Asset Ownership*. Plaintiff contends that his complex and layered asset ownership structure was done at the advice of EY, and that he did not intend to conceal any assets by using foreign entities and shell companies. Plaintiff again fails to appreciate that the

inquiry here is focused on what appeared to be happening. Even assuming a justifiable explanation in fact exists for parking one's assets in a tax haven, purity of motive alone would not be dispositive, nor would it undermine the reasonableness of the jeopardy assessment. The key consideration must be whether the plaintiff appeared to be manipulating his property to place it beyond the Government's reach. *See Revis*, 558 F.Supp. at 1077.

### 2. Plaintiff also appeared to be approaching insolvency.

Plaintiff incorrectly contends that insolvency is not a factor supporting the jeopardy assessment. However, Plaintiff's actions gave the impression that he was either insolvent or soon to be insolvent. Plaintiff only reported taxable income in three of the past 15 years and claimed to have negative $130 million in adjusted gross income in 2019. In 2017, he shut down his car racing team, publicly acknowledging he could no longer support the team and its members. In 2020, he received $1800 in stimulus funds, suggesting his financial picture was very poor.

The Treasury Regulation relating to jeopardy assessments, 26 C.F.R. § 301.6861-1(a), cross-references 26 C.F.R. § 1.6851-1(a)(i) to (iii) (termination assessments) for three factors where a jeopardy assessment is reasonable. One of these factors is when "the taxpayer's solvency is or appears to be imperiled," but not where the taxpayer becomes insolvent because of the accrual of the tax at issue. *See* 26 C.F.R. §1.6851-1(a)(iii) & flush language. Plaintiff suggests this flush language means the United States is barred from arguing that Plaintiff's financial solvency is or appears to be imperiled as a factor supporting jeopardy assessment. However, the facts and circumstances of this case demonstrate that Plaintiff's financial solvency appeared imperiled independent of his 2000 and 2001 tax liabilities: he had been reporting no taxable income for years and even received stimulus payments related to the COVID-19 crisis.

### 3. Subsequent evidence proves the IRS's concerns

When determining whether the jeopardy assessment was reasonable, the Court must review the information available to the IRS at the time of the jeopardy determination and assessment, as well as any other information that bears on this issue. *Haskin*, 444 F.Supp. at 304 (citing S. Rep. No. 94-938 at 365); *see also Wellek*, 324 F Supp.2d. at 911; *Harvey*, 730 F.Supp. at 1104; *Loretto*, 440 F.Supp. at 1173. Contrary to Plaintiff's assertions, this can include information that the IRS learned after it made its determination and made the assessment. *Wellek*,

324 F.Supp.2d at 911; *Camp v. Commissioner of Internal Revenue*, 635 F.Supp. 585, 587 (E.D. La. 1986); *Nolan*, 539 F.Supp. at 790; *Loretto*, 440 F.Supp. at 1173.

Here, the IRS's concerns that the proceeds from the Alamo Property would be dissipated or transferred offshore were confirmed. SMD (Plaintiff's nominee) received $16,445,334.63 in funds from the sale. However, after the IRS served Plaintiff with notice of the jeopardy assessment and jeopardy levies, but before the IRS could levy on SMD's account, $16,203,040.17 of the sale proceeds were wired to an account at the Royal Bank of Scotland in the Isle of Man.

### D.  Plaintiff's Arguments Fail to Show that the IRS Acted Unreasonably

Plaintiff attempts to discredit the IRS's determination by contending that individual facts and situations the IRS relied on were either wrong or that Plaintiff has an explanation. What Plaintiff really is suggesting is that the Court make factual findings on every fact or situation in a vacuum rather than looking at the totality of circumstances. By doing so, Plaintiff improperly seeks to convert this summary proceeding into a full adjudication of whether every fact the IRS relied on was correct. That is not the law, and the Court should reject Plaintiff's invitation. *See Dengin v. Commissioner*, 2017 WL 2889678, *2 (C.D. Cal. June 13, 2017).

#### 1. Plaintiff invents a broad legal standard that does not exist

On page 5 of his motion, Plaintiff cites *Fumo v. United States*, 2014 WL 2547797 (E.D. Pa. June 5, 2014), *Burd v. United States*, 774 F. Supp. 903 (D. N.J. 1991), and *Hirschhorn v. United States*, 662 F. Supp. 887 (S.D.N.Y. 1987) as purportedly creating two broad situations where jeopardy assessment is unreasonable. None of these cases set forth such a broad test or principle. Further, no Court has cited any of these cases for such broad legal principles.

The salient facts in *Fumo*, *Burd*, and *Hirschhorn* are not present here. This case is unlike *Fumo*, because here Plaintiff admits he has insufficient assets to pay his liabilities, whereas in *Fumo* the taxpayer owed about $2.75 million in tax, but had over $2.8 million in his bank accounts and still owned valuable properties (that were not under contract to be sold). In addition, the *Fumo* court was persuaded that the taxpayer's transfer of assets to family members was to allow them to manage his financial affairs while he was incarcerated. Here, Plaintiff has

no similar reason to have shuttled assets offshore. In *Burd*, the main issue was an unreliable witness: the Court found it unreasonable for the IRS to assert jeopardy assessments when the only evidence was the statements of an unreliable ex-husband with a vendetta against the taxpayer. In this case, the IRS has not relied upon any questionable informants with improper motives. Finally, in *Hirschhorn*, the taxpayer was arrested with a large amount of cash in front of a bank branch. The Court found the assessment unreasonable because (i) the cash was not from an illegal source, as the criminal case was dropped, and (ii) the fact that plaintiff was found with cash in front of the bank implied that he actually banked there (and was not cash-based). There are no similar facts in this case. Plaintiff's strained attempt to wedge himself into the pattern of these few cases is telling: the IRS was reasonable here.

### 2. Plaintiff Misconstrues the "Quickness" Legal Test

Plaintiff, citing *Fumo*, contends that because his abusive tax shelter participation, certain transfers or sales of assets, and some dealings in complex layers of entities were not undertaken in the immediate past, they cannot form part of the IRS's jeopardy determination. Plaintiff is wrong. To accept Plaintiff's proposed standard would put every wealthy taxpayer who spends years carefully obfuscating his financial affairs at an implicit advantage – not only will assessment of any liability take decades, but by the time the IRS can finally collect, it will take the taxpayer just a few phone calls to make sure his assets slip away to a tax haven.

Fortunately, this is not the standard. The weight of authority interprets "designing quickly" to place assets out of the reach of the Government as meaning "prior to the time that the government can undertake collection activities." Thus, a plan of liquidating assets over a period of time before the Government can collect meets the test. *See French v. United States*, 1979 WL 1430, *3-4 (E.D. Okla. July 31,1979) (leading case); *see also Harvey*, 730 F.Supp. at 1107; *Felkel*, 570 F.Supp. 833 at 838; *Revis*, 558 F.Supp. at 1078; *DeLauri*, 492 F.Supp. at 442. *Fumo* is a single outlier that disagrees with the *French* line of cases on this point. It is not binding or persuasive, and this Court should not follow it and should instead follow the majority view under *French*. As the *French* line of cases hold, if there is a pattern of placing assets out of the reach of the Government, even if over a span of years, that is sufficient.

But, in a way, this is all a red herring, as there is no dispute that any possible "quickness" is met with the sale of the Alamo Property, which happened just months ago. Although Plaintiff had placed the Alamo Property on the market in the past, it was the fact that a sale was pending that triggered action. Further, there do not appear to have ever been any serious offers nor does it appear that the listing had resulted in a pending sale before, so the sudden pending sale caused the urgency. Nevertheless, all of the other factors that point to reasonableness, even if they occurred over the course of the past few years, are relevant under *French*.

### 3. It Is Not Relevant that the IRS May Have Gotten Some Facts Wrong

Plaintiff spends most of his Petition and Motion complaining that the IRS got facts wrong or may have misconstrued or made incorrect assumptions. Regardless of what "excuses" Plaintiff may offer as to what was "really" occurring in his financial world, it is inescapable that his actions gave the appearance that collection of these taxes was in jeopardy. *See Revis*, 558 F.Supp. at 1077 (Assuming arguendo that some justifiable explanations did in fact exist, purity of motive alone would not be dispositive of the issues. The key consideration must be whether or not the plaintiff appears to be manipulating his property and estate in such a manner as to place them beyond the reach of the Government.)

Courts have made clear that a jeopardy assessment is not unreasonable if some of the IRS's information is inaccurate so long as it appeared to be correct when the IRS made its determination. *Serpa*, 1981 WL 1759 at *2 ("[I]t is not essential that every fact upon which the determination is based be proven accurate in a subsequent judicial proceeding in order for that determination to be reasonable under § 7429 . . . The standard is one of reasonableness, not one of substantial evidence."); *Golden West Holdings Trust*, 2009 WL 1457107 at *4; *Varjabedian*, 339 F.Supp.2d at 155; *Wellek*, 324 F.Supp.2d. at 911; *Golden ADA, Inc.*, 934 F.Supp. at 345 ("Whether Golden ADA in fact intended to liquidate its assets and place them beyond the reach of the IRS thereby avoiding payment of its taxes is irrelevant. It is the appearance of such things that is relevant and controlling."); *Cantillo*, 559 F.Supp. at 207; *Revis*, 558 F.Supp. at 1078;

Plaintiff contends that had the IRS done more investigation, it would not have made any errors. Specifically, Plaintiff contends that had the IRS reviewed state tax return filings, it would

have seen that the Lillehammer Trust was the alleged owner of SMD. First, Plaintiff's contention that the Lillehammer Trust owns SMD, and thus the Alamo Property, does not make it so. Had the IRS looked at yet more paper filings that were created to give the impression that someone or something other than Plaintiff owned the Alamo Property, that would not have settled anything. Notwithstanding that important point, the premise of Plaintiff's argument is that the IRS should have done more work. However, the IRS lacks the ability to view state tax returns. Smith Decl., ¶ 110. As a result, Plaintiff's suggestion that the IRS should have done so is misplaced.

Importantly, Plaintiff does not argue that the IRS should have look at *publicly* filed documents, presumably because he knows that the publicly available documents do not reveal the Lillehammer Trust. Nor did Plaintiff's own Forms 3520 and 3520-A for the Lillehammer Trust inform the IRS of its purported ownership of SMD, although they listed other assets. Declaration of Appeals Team Case Leader Michael S. Toni ("Toni Decl."), ¶ 13. In the end it does not matter, because the Lillehammer Trust was no more the "owner" of the Alamo Property than SMD. Instead, the true owner was Plaintiff. The Court need not resolve this dispute, however, because it is not required to (nor should it) decide the actual ownership of the Alamo Property. *See Dengin*, 2017 WL 2889678, *2. In *Dengin*, the reasonableness of the jeopardy assessment turned on a question as to whether the taxpayer or a nominee owned property. In finding that the IRS acted reasonably, the court noted that "the mere existence of a factual dispute is not sufficient to invalidate a jeopardy assessment. Indeed, if that were the case, few jeopardy assessments could survive and . . . § 7429(b) would be nullified."

In any event, as described above, evidence the IRS obtained after it issued the jeopardy assessment shows that Plaintiff owned the Alamo Property, controlled the sales proceeds, and directed them offshore. Of particular note, in the FIRPTA form. Plaintiff financially benefitted from his representation that he owned the property. Normally the buyer of real property is required to withhold 15% of the amount realized from a sale unless the seller states in an affidavit that the seller is not a foreign person. *See* 26 U.S.C. § 1445. Because Plaintiff stated he owned the Alamo Property, the buyer did not have to withhold approximately $2.5 million.

The following evidence also supports Plaintiff's ownership and control of the Alamo Property:

- Documents received from the escrow company show that Plaintiff first formed SMD and was its original owner until Plaintiff purported to assign his 100% interest in SMD to the Lillehammer Trust on February 9, 2011. Smith Decl., ¶ 102 and Exhibits 106-107. This disproves his assertion that he never owned SMD.

- Bank records for SMD show that sale proceeds were initially wired into SMD's domestic bank account at Bank of America, account ending 0180. *Id.*, ¶¶ 106, 108 and Exhibit 111. Then, after the IRS provided notice to Plaintiff that the jeopardy assessment had been made against him, the vast majority of the proceeds were wired in several wire transfers to a foreign bank account in the Isle of Man in the name of the Lillehammer Trust. *Id.*, ¶ 108.

- Plaintiff is the only authorized owner or member of SMD on its bank signature card and is one of two authorized signers for SMD's account. *Id.*, ¶ 106 and Exhibit 110. Thus, Plaintiff had the ability to direct the funds from SMD to the Lillehammer Trust's Isle of Man bank account and there is no evidence that any of the Lillehammer Trust's other beneficiaries could have done so. This squarely contradicts assertions in Plaintiff's filings regarding his lack of ownership of SMD at the time the Alamo Property was acquired, and his lack of control of the sale proceeds.

- Records show that most of the deposits into SMD's account were sourced from a Bank of America account ending 2683 in the name of Plaintiff's sole proprietorship, Kevin Kalkhoven, Sole Prop. Smith Decl., ¶¶ 106, 107 and Exhibits 111-112.

Thus, at every turn the facts support Plaintiff's dominion over both SMD and the Alamo Property.

### 4. Plaintiff's Procedural Objections Fail

Plaintiff next raises a number of procedural objections in arguing that the IRS acted unreasonably. Because the Court will be conducting a *de novo* review, these arguments are not relevant and are nothing more than another red herring to distract the Court from Plaintiff's actions.

### a. There is Nothing Wrong with the Approval Form

In his Petition, Plaintiff vaguely contends the IRS approval process was somehow flawed, because he received a partially redacted copy of IRS Form 2644, *Recommendation for Jeopardy Assessment*, despite having received an unredacted copy on August 12, 2021. Toni Decl., ¶ 18 and Exhibit 114. Plaintiff erroneously insinuates that electronic signatures applied using Adobe Acrobat (some with digital time-stamped certificates but 3 without) in a period of remote work

during a pandemic are somehow problematic. They are not. *See Chadwick v. Comm'r*, 154 T.C. 84, 94-95 (2020) (electronic signatures sufficient to show compliance with approval requirements of 26 U.S.C. § 6751(b)). The digital signatures demonstrate clear agreement that each individual who signed the form recommended the jeopardy assessment. Plaintiff also objects that IRS employees electronically signed the form within hours of each other. This is a meaningless objection, as the IRS began the process of obtaining the necessary approvals in mid-to-late June 2021, and thus the employees had ample time to consider the matter prior to the final recommendation form being signed. Smith Decl. ¶¶ 81, 83.

### b. Appeals Fully Considered Plaintiff's Protest and Arguments

Plaintiff erroneously complains IRS Appeals did not fully consider his protest. In fact, IRS Appeals fully considered Plaintiff's arguments, engaged in a meaningful conference lasting approximately three and a half hours, entertained argument and asked questions about the exhibits. Toni Decl. ¶¶ 3-26. IRS Appeals was simply unpersuaded by Plaintiff's arguments and sustained the jeopardy assessment. *Id*. There is nothing wrong with what IRS Appeals did.

### c. Interview Objections are Meaningless

Plaintiff incorrectly argues that the IRS violated Internal Revenue Manual ("IRM") 4.15.1.9.2 by failing to first interview him. The IRM is non-binding does not have the force of law. *Fargo v. C.I.R.,* 447 F.3d 706, 713 (9th Cir. 2006). Further, RO Smith reasonably believed that interviewing Plaintiff at that time might have further jeopardized collection and chose not to do so as provided in IRM 4.15.1.9.2. Smith Decl., ¶ 84.

### 5. Jeopardy Cases Do Not Have to Involve Criminal Activity

Lastly, Plaintiff complains that the IRS should not have made a jeopardy assessment against him because he is not a criminal nor charged with any crime. Although some jeopardy assessments arise out of criminal activity, the law certainly does not require it as a prerequisite. Plaintiff further states that a jeopardy assessment against him is inappropriate because he is a compliant taxpayer. This description is surprising given that Plaintiff engaged in multiple illegal abusive tax shelters to avoid taxes on his large income in 1999-2001, has paid federal income tax only three times in the last 16 years using a very large and unexplained net operating loss to

eliminate income, and has moved an enormous amount of money offshore and beyond the reach of IRS collection.

### E.   The IRS Properly Levied On Assets Of Kimm

Plaintiff contends that the IRS improperly levied on bank accounts that separately belong to his wife Kimm, and some to Kimm and Plaintiff's stepson. The IRS's levy on accounts owned by Kimm at Bank of America was proper based on California community property law. *Id.*, ¶ 92; *see also Babb v. Schmidt*, 496 F.957, 958-60 (9th Cir. 1974). In addition, after the levies were served, RO Smith provided Plaintiff's representative the opportunity to offer proof that the levies had caused hardship and/or that the levied funds were the separate property of Kimm and if they were, RO Smith said she would consider a levy release or partial levy release. *Id.*, ¶ 93. RO Smith received no such proof. *Id.*

### F.   The Amounts Assessed Are Appropriate

In this case, Plaintiff has raised no objection to the amount of the assessment and thus has now waived any right to do so. However, in abundance of caution, we include information to support and show the appropriateness of the amount of the assessment. Exhibit 42 to the Report and the declaration of RA McGinnis explain the basis for the adjustments. McGinnis Decl., ¶¶ 14-21.

## IV.   CONCLUSION

Based on the foregoing, the Court should deny Plaintiff's Petition and Motion and instead find that the jeopardy assessment is reasonable and the tax assessments are appropriate. DATED this 27th day of August, 2021.

DAVID A. HUBBERT
Acting Assistant Attorney General

*/s/ Jeremy N. Hendon*
JEREMY N. HENDON

*/s/ Nithya Senra*
NITHYA SENRA
Trial Attorneys, Tax Division
U.S. Department of Justice
*Attorneys for United States of America*

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the foregoing Response in Opposition with accompanying exhibits as identified in the attached Index of Exhibits, as well as the declarations of Revenue Officer Shelley Smith, Revenue Agent Michael McGinnis, and Appeals Team Case Leader Michael S. Toni, has been made this 27th day of August, 2021 via the Court's CM/ECF system to:

| | |
|---|---|
| Michael L. Charlson | mcharlson@velaw.com |
| Christopher James | cjames@velaw.com |

*/s/ Nithya Senra*
NITHYA SENRA
Trial Attorney, Tax Division
U.S. Department of Justice