UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Kevin Kalkhoven, | No. 2:21-cv-01440-KJM-JDP |
| Plaintiff, | ORDER |
| v. | |
| United States of America, | |
| Defendant. | |

Kevin Kalkhoven appeals the jeopardy assessment the Internal Revenue Service (IRS) has effected against him.  Specifically, Kalkhoven asks this court to abate the jeopardy assessment and the liens and levies imposed by the IRS.  Having considered the parties' briefing and arguments made at hearing, the court denies the motion as explained below.

I.      BACKGROUND

On July 6, 2021, the IRS initiated a jeopardy assessment against Kevin Kalkhoven. Compl. ¶ 1, ECF No. 1.  The assessment was based on a number of factors: a review of Kalkhoven's tax returns for the last twenty years, primarily for tax years 2000 and 2001; his participation in various tax shelters with substantial assets held in offshore accounts, a subject which is the subject of ongoing litigation; and the sale and timing of sale of major real estate holdings, the proceeds of which the IRS believes flow to Mr. Kalkhoven.  *See generally* Jeopardy Recommendation Report, Pl. Ex. B, ECF No. 18-4.  One such real estate sale includes the June

1   2021 sale of a 100-acre property in Alamo, California valued at $30 million with an asking price

2   of $19.5 million, that sold for $16.9 million; while an entity known as St. Moritz Dorf, LLC was

3   the purported seller, the IRS believes Kalkhoven actually owned the property and directed the

4   sale or otherwise controlled the asset in ways that have benefitted him personally.  *Id*. at 5, 10–11;

5   Gov. Br. at 3, ECF No. 22.  The sale of the Alamo property followed a March 2021 decision by

6   the D.C. Circuit Court of Appeal, "finding that one partnership [Kalkhoven] had invested in was a

7   sham."  Gov. Br. at 3; *BCP Trading and Investments, LLC v. Comm'r*, 991 F.3d 1253 (D.C. Cir.

8   2021) (affirming the Tax Court's decision the BCP Trading & Investments, LLC partnership was

9   a sham).  Based on the partnership dealings and applicable loan penalty and tax penalty interest,

10  the IRS calculated Kalkhoven would owe $349,576,778 in taxes once the decision became final.

11  Jeopardy Recommendation Report at 14.

12          Kalkhoven appealed the jeopardy assessment to the IRS Appeals Team, arguing the

13  determination was "largely based on factual inaccuracies and faulty reasoning."  Compl. ¶ 3.  The

14  IRS Appeals Team held a hearing on August 10, 2021.  *Id*.  Kalkhoven alleges the IRS Appeals

15  Team Case Leader "declined to consider any evidence" he presented, *id*. ¶ 4, and determined the

16  assessment was reasonable.  *Id*.

17          Kalkhoven initiated this action under 26 U.S.C. § 7429, seeking judicial review of the

18  jeopardy assessment and levy.  *See generally* Compl.  He asks the court to abate the assessment in

19  full, "to bar the IRS from any future action to enforce the [a]ssessment or to levy against any

20  property pursuant to it, and to have the many items of property improperly seized or frozen by the

21  IRS restored to their rightful owners."  *Id*. ¶ 1.  Kalkhoven has filed a Motion for Determination

22  of Petition Judicial Review, ECF No. 18-1, to which the government has responded, ECF No. 22.

23  The court held a videoconference hearing on the matter on August 30, 2021.  Michael L. Charlson

24  appeared and argued for the plaintiff and Jeremy Nolan Hendon appeared and argued for the

25  government.[1]  Following hearing, the court directed focused supplemental briefing, which is now

---

[1]  Kalkhoven filed supplemental exhibits on the day of hearing, without leave of court.  At hearing, the government moved to strike the documents.  Kalkhoven opposed.  The granting of a motion to strike "may be proper if it will . . . eliminate serious risks of prejudice to the moving party, delay, or confusion of the issues."  *Taheny v. Wells Fargo Bank, N.A*., No. 10-2123, 2011

1    also before the court.  Min. Order, ECF No. 30; Pl. Suppl. Br., ECF No. 31; Gov. Suppl. Br., ECF

2    No. 32.

3    **II.     LEGAL STANDARD**

4           "Under normal assessment procedure, there is usually a considerable lapse of time

5    between a taxpayer's first notice that the IRS is seeking to collect the tax and the actual enforced

6    collection of the tax." *Burd v. United States*, 774 F. Supp. 903, 905 (D.N.J. 1991).  The lapse in

7    time is "due in part to the taxpayer's right to contest [the assessment] in the United States Tax

8    Court." *Id*.  Under 26 U.S.C. § 6861 "[i]f the collection of income tax will be jeopardized by

9    delay, the IRS is statutorily authorized to expedite collection by immediate levy, via a jeopardy

10   assessment, upon a taxpayers' property." *Olbres v. Internal Revenue Serv.*, 837 F. Supp. 20, 21

11   (D.N.H. 1993).  "[T]he jeopardy proceeding is of a summary nature and does not amount to a

12   final determination of plaintiff's correct tax liability." *Varjabedian v. United States*, 339 F. Supp.

13   2d 140, 144–45 (D. Mass. 2004) (citation and marks omitted).

14          Under the statute Kalkhoven invokes here, 26 U.S.C. § 7429(b), a taxpayer may seek

15   judicial review of a jeopardy assessment. *See id.* § 7429(b)(1)–(2)("[T]he taxpayer may bring a

16   civil action against the United States for a determination under this subsection -- district courts of

17   the United States shall have exclusive jurisdiction over any civil action for a determination under

18   this subsection).  The court's review is de novo. *Olbres*, 837 F. Supp. at 21; *Fumo v. United*

19   *States*, No. 13-3313, 2014 WL 2547797, at *16 (E.D. Pa. June 5, 2014) ("The district court's

20   review . . . gives the IRS's administrative determination regarding the jeopardy assessment no

21   deference whatsoever.").  The district court's consideration is limited to determining only

22   1) whether the jeopardy assessment was reasonable under the circumstances, and 2) whether the

23   amount assessed was appropriate.  26 U.S.C. § 7429(b)(3); *Olbres*, 837 F. Supp. at 21.  The

24   government bears the burden on the first issue, while the taxpayer bears the burden of proof on

25   the second.  26 U.S.C. § 7429(g)(1)–(2).  Here, Kalkhoven does not challenge the amount

26   assessed and so the court need only address the first question.  In doing so, it bears in mind that

---

WL 1466944, at *2 (E.D. Cal. Apr. 18, 2011) (citation omitted).  The court **grants** the motion to strike.

1   "'[r]easonable under the circumstances' means something more than 'not arbitrary or capricious'

2   and something less than 'supported by substantial evidence.'" *Varjabedian*, 339 F. Supp. 2d at

3   144–45 (citation omitted).  "To sustain its jeopardy assessment the government need only show

4   that circumstances are such that collection of taxes owed *might* be jeopardized if collection efforts

5   are delayed pending routine administrative processing—not that collection actually will be

6   jeopardized." *Olbres*, 837 F. Supp. at 22 (emphasis added).[2]

7       In conducting this "form of summary judicial review . . . the courts may decide the case

8   based on affidavits only and need not conduct an evidentiary hearing." *Arnold v. United States*,

9   1998 U.S. Dist. LEXIS 22310, *18–19 (M.D. Fla. Apr. 13, 1998) (collecting cases).  In reaching

10   its conclusion, the court "can hear evidence that may be inadmissible in a trial . . . [and] take into

11   account not only information available to the [IRS] on the assessment date, but also any other

12   information which bears on the issues before it." *Varjabedian*, 339 F. Supp. 2d. at 144 (citation

13   and marks omitted).  The district court's determination is "final and conclusive and shall not be

14   reviewed by any other court."  *See* 26 U.S.C. § 7429(f).

15       The statute provides that the court must make its determination within "20 days after a

16   proceeding is commenced," 26 U.S.C. § 7429(b)(3), unless "the taxpayer requests an extension of

17   the 20-day period" with any extension not to exceed 40 additional days, *id.* § 7429(c).  Here, after

18   hearing, Kalkhoven requested an extension of fourteen days, ECF No. 25, and the court is issuing

19   its order on the last day of the extended time period.

20   **III.   ANALYSIS**

21       **A.   Jurisdiction**

22       In its briefing, the government contended as a threshold matter that Kalkhoven has not

23   exhausted his administrative remedies with respect to appealing the levies imposed.  At hearing

---

[2] While most courts articulate a general reasonableness standard, one court has adopted preponderance of the evidence as the standard applicable to a district court's review of a jeopardy assessment.  *Compare Bremson v. United States*, 459 F. Supp. 121, 126 (W.D. Mo. 1978) (citations omitted) ("In these civil proceedings, the burden of proof varies from issue to issue and the standard is one of 'reasonableness' and 'appropriateness' under the circumstances.") *with Burd*, 774 F. Supp. at 906 (The government's burden "must be shown by a preponderance of the evidence.").  This court adheres to the majority trend.

the parties agreed the court has jurisdiction to decide whether the underlying jeopardy assessment

is reasonable, even though the issue of the individual levies imposed is not ripe for review and not

before the court. Regarding jurisdiction generally, one appellate court appears to have signaled §

7429(b) allows the district court to review an IRS jeopardy assessment only after the taxpayer has

filed a request for administrative review. *Hiley v. United States*, 807 F.2d 623, 627 (7th Cir.

1986). The statute includes permissive language, and provides

> the taxpayer may bring a civil action . . . in the [district] court with
> jurisdiction" within 90 days of whichever is earlier:
>
> > (A) the day the Secretary notifies the taxpayer of the
> > Secretary's determination described in subsection (a)(3), or
>
> > (B) the 16th day after the request described in subsection
> > (a)(2) was made[.]

26 U.S.C. § 7429(b)(1). The subsection (a)(2) referenced toward the end of this statutory text

provides that, within 30 days after receiving the IRS's written notice of the assessment "or within

30 days after the last day of the period within which such statement is required to be furnished,"

the taxpayer "may request the Secretary to review the action taken." 26 U.S.C. § 7429(a)(2).

Assuming without deciding that some form of exhaustion is required even at this stage,

the court finds it has jurisdiction to determine the reasonableness of the jeopardy assessment here.

Kalkhoven sent the IRS his Jeopardy Levy and Lien Protest letter, challenging the levies and

liens, on August 6, 2021. Gov. Br. at 14. He then sent a letter and "protest" of the assessment to

the IRS Appeals Team. Toni Decl. ¶ 3, ECF No. 22-43. Appeals Team Case Leader Michael

Toni held a virtual conference with plaintiff's counsel on August 10, 2021. *Id.* ¶ 7. In his

complaint, Kalkhoven expressly pleads that he filed an appeal of the jeopardy assessment with the

IRS Appeals, and the IRS then "determined that the [a]ssessment 'was reasonable.'" Compl.

¶¶ 3–4. Kalkhoven filed his motion in this court on August 12, 2021.

## B. Reasonableness

In determining whether a jeopardy assessment is reasonable courts generally look to see if

one of three conditions set forth by the Treasury Regulations is present. *Larson v. United States*,

No. 11-03093, 2011 WL 2682991, at *2 (N.D. Cal. July 11, 2011); *Fumo*, 2014 WL 2547797, at

*15.  The three conditions are:

> (i) The taxpayer is or appears to be designing quickly to depart from the United States or to conceal himself or herself.

> (ii) The taxpayer is or appears to be designing quickly to place his, her, or its property beyond the reach of the Government either by removing it from the United States, by concealing it, by dissipating it, or by transferring it to other persons.

> (iii) The taxpayer's financial solvency is or appears to be imperiled.

26 C.F.R. § 1.6851–1(a)(1).  "While courts traditionally consider these three conditions, the analysis 'is not in any way, shape or form restricted thereto.'"  *Varjabedian*, 339 F. Supp. 2d at 155 (quoting *Revis v. United States*, 558 F. Supp. 1071, 1078 (D.R.I. 1983)); *see Mesher v. United States*, 736 F. Supp. 233, 235–36 (D. Or. 1990) (considering "[p]ossession of, or dealing in, large amounts of cash," "[p]ossession of . . . evidence of other illegal activities," "[p]rior tax returns reporting little or no income despite the taxpayer's possession of large amounts of cash," "[d]issipation of assets through forfeiture, expenditures for attorneys' fees, appearance bonds, and other expenses," "[t]he lack of assets from which potential tax liability can be collected," "[u]se of aliases," "[f]ailure to supply appropriate financial information when requested," and "[m]ultiple addresses") (citations omitted)).  Several courts have considered additional factors such as whether:

> the taxpayer travels abroad frequently, . . . the taxpayer is leaving or may be expected to leave the country, . . . the taxpayer has recently conveyed real estate, . . . or discussed such conveyance, . . . the taxpayer controls bank accounts containing liquid funds, . . . the taxpayer has not supplied public agencies with appropriate forms or documents when requested to do so, . . . the taxpayer controls numerous business entities, . . . the taxpayer attempts to make sizable bank account withdrawals at the time of the assessment, . . . the taxpayer maintains foreign bank accounts, . . . the taxpayer takes large amounts of money offshore, . . . the taxpayer has many business entities which can be used to hide his assets.

*Bean v. United States*, 618 F. Supp. 652, 658 (N.D. Ga. 1985) (citations omitted).

Upon consideration of all the information presented and the totality of the circumstances, the court finds the government has carried its burden here.  Application of the second regulatory provision, focusing on whether the taxpayer "is or appears to be designing quickly to place his,

6

her, or its property beyond the reach of the Government either by removing it from the United States, by concealing it, by dissipating it, or by transferring it to other persons," is dispositive. 26 C.F.R. § 1.6851–1(a)(1)(ii). Kalkhoven argues fundamentally the assessment was not reasonable under the circumstances because he was not acting quickly to conceal assets. Pl. Br. at 2–3, 5. Kalkhoven's efforts to show he was acting in good faith are unavailing, however,[3] if the IRS shows it acted reasonably. *See Varjabedian*, 339 F. Supp. 2d at 155 (citation omitted) ("The government need not ultimately be correct in thinking that collection was imperiled, rather, '[t]he government only needs to prove that the circumstances *appear* to jeopardize collection.'" (emphasis in original citation omitted)). The court finds the IRS has shown it acted reasonably based on the appearance Kalkhoven was acting quickly, under the circumstances, to place his assets beyond the government's reach by transferring them out of the United States or otherwise concealing them. There are three primary reason for this conclusion.

### 1.      Background, Ownership and Sale of Alamo Property

In 1999 to 2000, Kalkhoven participated in the tax shelter that would result in years of litigation, culminating in the D.C. Circuit decision, and in 2000 he settled the Lillehammer Trust, of which he is a beneficiary. Revised Timeline at 12, ECF No. 18-24 (Kalkhoven revised timeline originally prepared by IRS). In 2005, Kalkhoven opened a Bank of America account for an entity identified as St. Moritz Dorf, acting as its sole member and owner. Bank Signature Card, ECF No. 22-38. Kalkhoven opened this account even though he also claims the Lillehammer Trust "owned 100 percent St Moritz since February 2001." Wildman Decl. ¶ 2,

---

[3] Kalkhoven argues he disclosed the existence of all his assets on his tax returns and the fact of disclosure also renders the assessment unreasonable. However, it is unclear what underlying assets were disclosed. Gov. Suppl. Br at 4; *compare Fumo*, 2014 WL 2547797, at *21 ("Defendant knows the location and amount of the proceeds from [p]laintiff's real estate sales . . . . Moreover, the IRS was able to trace the transfers using only public records, which does not tend to show an appearance of trying to hide assets from the government"). Although Kalkhoven may have disclosed the entities that hold certain assets "the mere disclosure of entity names does not negate the added complexity and collection difficulty that attends such schemes. To find otherwise would reward those who engage the most sophisticated advisors and encourage taxpayers to establish complex asset-holding schemes that they can disclose on the surface to escape potential jeopardy assessment or collection." Gov. Suppl. Br at 4.

1   ECF No. 18-43; *but see* First Am. to Regulations of St. Moritz Dorf, LLC at 1, ECF No. 22-35

2   (Amendment dated 2019 noting Kalkhoven transferred "his entire . . . [100%] interest in [St.

3   Moritz Dorf] to Cook Islands Trust Ltd.,[4] as Trustee of the Lillehammer Trust").  Also in 2005,

4   St. Moritz Dorf is identified on the grant deed as purchasing the Alamo property, *see* Grant Deed,

5   ECF No. 22-41, even though the IRS could find "no evidence that [St. Moritz Dorf] had any

6   assets or was otherwise funded at its formation or any time thereafter," *see* Smith Decl. ¶¶ 38–39,

7   ECF No. 22-28.  Despite St. Moritz Dorf's apparent ownership of the property, Kalkhoven was

8   the one who used the property, living there "from approximately 2007 . . . until . . . 2015."

9   Kalkhoven Decl. ¶ 29, ECF No. 18-33.  According to Kalkhoven, the Alamo property was listed

10   for sale on July 4, 2013, by St. Moritz Dorf, which Kalkhoven avers "was owned by Lillehammer

11   Trust."  Revised Timeline at 13.  At this point, the BCP Trading & Investments litigation was

12   underway.  *Id.*  "[T]he Trustee decided to take the property off the market for a short time. . .

13   list[ing it] for sale again, starting in February 2015.  Wildman Decl. ¶ 7.

14          In March 2021, as noted, the D.C. Circuit Court of Appeal affirmed the Tax Court

15   decision to uphold the IRS Commissioner's tax adjustments against the BCP Trading &

16   Investments partnership on the basis that it was a sham partnership.  *BCP Trading & Invs., LLC*,

17   991 F.3d at 1257.  Within approximately two months, by May 2021, a sale of the Alamo property

18   was pending, and the sale was finalized in June.  Revised Timeline at 14.  Proceeds from the sale

19   totaling $16.9 million were initially deposited into the St. Moritz Dorf Bank of America account

20   that Kalkhoven had established and for which he and Wildman had signature authority.  Bank

21   Signature Card at 3; Checking Account Statement at 189, ECF No. 22-39.

22          In light of the apparent inconsistencies in the Alamo Property's ownership records, the

23   liquidation of a substantial asset and large amount of funds transferred into an account over which

24   Kalkhoven appears to have had some measure of individualized control, the IRS had reason to

25   believe measures were in place and efforts being made to transfer funds out of its reach.

---

[4] "Lillehammer was originally formed on or about October 3, 2000, as a Cook Islands trust."  Wildman Decl. ¶ 2.

1

### 2.    Timing of Alamo Property Sale

2       Moreover, given the proximity in time of the Alamo Property sale to the D.C. Circuit's

3   ruling in the underlying tax shelter matter, it was reasonable for the IRS to believe Kalkhoven's

4   assets would likely be out of reach by the time the tax litigation was resolved.  Gov. Br. at 3.

5   Kalkhoven contends the sale of the property cannot be considered as "moving quickly" because

6   the property had been listed on the market for several years.  Pl. Br. at 12.  The court is not

7   persuaded.  "[C]ourts have held that it is not necessary for the United States to demonstrate

8   immediate dissipation or removal of assets.  Rather, the test is whether the collection of the taxes

9   would be rendered ineffective or jeopardized if collection efforts are delayed during the standard

10   preassessment and precollection administrative review."  *Harvey v. United States*, 730 F. Supp.

11   1097, 1107 (S.D. Fla. 1990) (citation omitted); *see Revis*, 558 F. Supp. at 1078 (noting "speed is

12   . . . a relative concept"; collecting cases of taxpayer actions spanning years).

13       Here, it was particularly reasonable for the IRS to conclude it appeared Kalkhoven could

14   and would place assets beyond the reach of the IRS in light of his financial and tax history.  By

15   the time of the jeopardy assessment, an appellate court had found Kalkhoven used abusive tax

16   shelters, shell companies and foreign bank accounts to reduce his tax liabilities and keep creditors

17   away from his assets.  Gov. Br. at 4–6, 16–17; *BCP Trading & Invs., LLC*, 991 F.3d at 1272

18   ("We do not disagree with the Tax Court's conclusion that BCP and the Add-On had no practical

19   economic effect other than the creation of tax losses.  Client members invested only $16.5 million

20   in the option pairs and claimed $3.1 *billion* in tax losses.  Those losses were artificial. . . ."

21   (emphasis in original)); *see Bean*, 618 F. Supp. at 658.  The IRS also had reason to believe

22   Kalkhoven has engaged in a broader pattern of engaging in abusive tax shelters.  *See* Smith Decl.

23   ¶ 67(a) ("In 1999, [p]laintiff engaged in another abusive illegal Son-of-BOSS tax shelter that is

24   still the subject of a Tax Court case. *See Woodside Partners v. Commissioner*, docket no. 5685-

25   16.  It is expected that Plaintiff will owe an additional $25 million as a result of this case.").

26   Given that the key question is whether "the taxpayer *appears* to be manipulating his property and

27   estate in such a manner as to place them beyond the reach of the government," *Revis*,

28   558 F. Supp. at 1078 (emphasis added), the record here plainly supports the conclusion that it

9

1   reasonably appeared to the IRS Kalkhoven was taking steps to squirrel away a significant portion

2   of his assets.

3          After it issued the jeopardy assessment, the IRS learned "the sale proceeds from the

4   Alamo mansion ha[d] in fact been transferred offshore to the Isle of Man," a well-known tax

5   haven.  Gov. Br. at 10, 18–19; Smith Decl. ¶ 108.  This information is now before the court and

6   further bolsters the court's conclusion.  Even if these assets are now out of reach, Kalkhoven has

7   others in the United States it appears he also could easily and quickly move offshore if not for the

8   assessment and levies and liens.

9                    **3.     Questions Regarding Independence of Lillehammer Trust**

10         The government also questions the true independence of the Lillehammer Trust.  Gov. Br.

11  at 22; Gov. Suppl. Br. at 1.  Kalkhoven claims the trustee of this trust, Summerhill Trust

12  Company (Isle of Man) Limited, "had extremely broad powers to manage the trust property."  Pl.

13  Suppl. Br. at 5 n.8.  To support this contention Kalkhoven relies on the formation documents for

14  the Lillehammer Trust.  The documents he presents are authenticated only by Kalkhoven himself,

15  Kalkhoven Decl. ¶¶ 23–26; Deed of Settlement, Kalkhoven Decl. Ex. A, ECF No. 18-53; Deed of

16  Further Am. and Restatement, Kalkhoven Decl. Ex. B, ECF No. 18-35, and his personal pilot and

17  assistant who also serves as the sole manager of St. Moritz Dorf, Pierre Wildman, Wildman Decl.

18  ¶¶ 1, 16–17.  Among the various roles in which he serves, Wildman also is the manager of

19  Overlook Holdings, LLC, an entity owned by a trust settled by Kalkhoven's daughter, *id.* ¶ 14,

20  and which in turn owns the property in Nevada where Kalkhoven and his wife appear currently to

21  be living, Pl. Br. at 19.  Although Wildman purports to report to the Summerhill Trust Company,

22  particularly to Summerhill employee James Ramsey, Wildman Decl. ¶ 3, Mr. Ramsey has not

23  submitted a declaration.  Nor is there any declaration from any representative of Summerhill

24  explaining it is a truly independent trustee and how it satisfies the requirements of independence.

25  While it is the government that has the burden to show reasonableness, its pointing to the absence

26  of proof of the Lillehammer Trust's independence is sufficient here to support its reasonable

27  suspicions.  It appears only Kalkhoven or those with whom he associates are in a position to offer

28  the documentation and evidence that would establish independence so as to rebut the

1    government's position.  His having not cured whatever record deficiencies exist weighs against

2    him in the court's analysis.

3          Additionally, the government correctly notes the Lillehammer Trust's own formation

4    documents appear to leave open a possibility, however remote, that Kalkhoven could exercise

5    some control over it.  *See* Deed of Settlement at 26, Article IX, ECF No. 18-34 ("any trustee . . .

6    shall be at liberty to delegate all or any of the powers from time to time vested in it in respect of

7    receipt of income, or principal, payments, sale, purchase, and investment of the Trust Property to

8    any person or persons … in any part of the world (notwithstanding any rule of law to the contrary

9    . . .).

10         The court concludes the IRS's concerns about the independence of the Lillehammer Trust

11   are reasonable and further support its issuance of the jeopardy assessment.

12               **4.  Other Considerations**

13         While the court does not expressly rely on the government's theory of insolvency in

14   reaching its conclusion here, it notes the recent increase in asset sales attributable to Kalkhoven,

15   the large reported losses on his tax returns in recent years, his declining income earned in the

16   United States, and his receipt of $1,800 in COVID-19 stimulus suggesting a modest income.

17   Gov. Br. at 18; IRS, *Questions and Answers about the First Economic Impact Payment — Topic*

18   *A: Eligibility*[5] ("We issued payments of $1,200 . . . to individuals whose adjusted gross income

19   (AGI) did not exceed: $150,000 if married and filing a joint return, $112,500 if filing as  head of

20   household or, $75,000  for eligible individuals using any other filing status . . .").  While in its

21   supplemental briefing plaintiff's counsel assures the court that Kalkhoven's financial situation is

22   hardly "imperiled," Pl. Suppl. Br. at 1 n.1, the additional information the government points to

23   does raise red flags.

24         As the government has met its burden with respect to the reasonableness of the jeopardy

25   assessment, which is the only issue before the court, the court does not disturb the assessment.

---

[5] https://www.irs.gov/newsroom/questions-and-answers-about-the-first-economic-impact-payment-topic-a-eligibility (accessed Sept. 15, 2021).

1    **IV.    CONCLUSION**

2           The court **denies** plaintiff's motion.

3           This order resolves ECF No. 18.

4           The Clerk of Court is directed to close the case.

5           IT IS SO ORDERED.

6     DATED:  September 15, 2021.

7                                                    _____
                                                     CHIEF UNITED STATES DISTRICT JUDGE